NUMBER 13-07-00145-CR 



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


SEVERINO DAVID VASQUEZ, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 206th District Court 

of Hidalgo County, Texas.

 


MEMORANDUM OPINION


Before Justices Rodriguez, Garza, and Vela 


Memorandum Opinion by Justice Rodriguez



 Appellant, Severino David Vasquez, appeals from his murder conviction. See Tex.
Penal Code Ann. § 19.02(b)(1), (2) (Vernon 2003). By seven issues, Vasquez contends: 
(1) the trial court erred by limiting his voir dire examination of the jury panel; (2) the trial
court erred in admitting evidence that he and the accomplice witness had visited an
attorney; (3) the testimony of the accomplice was not sufficiently corroborated; (4) the
evidence was legally and factually insufficient to sustain his conviction; (5) the trial court
erred by allowing his "mug shot" to be displayed to the jury; and (6) the trial court erred by
allowing improper argument by the State. We affirm.

I. Background

 The body of Maria del Carmen Vasquez was discovered in a deserted area in
Sullivan City, Texas, on November 27, 2003. Vasquez, Maria's husband, was arrested for
her murder. Yolanda Salinas, Vasquez's paramour, pleaded guilty to Maria's murder and
testified against Vasquez for the State. A jury found Vasquez guilty of murder, and the trial
court sentenced him to life imprisonment in the Texas Department of Criminal Justice-Institutional Division. This appeal ensued.II. Commitment Question

 By his first issue, Vasquez contends that the trial court erred by limiting his voir dire
examination of the jury panel. The State responds that the trial court, instead, properly
precluded Vasquez from asking an improper commitment question. We agree with the
State.

A. Standard of Review and Applicable Law

 The trial court has broad discretion over the process of jury selection and its
discretion will not be disturbed absent an abuse of discretion. Barajas v. State, 93 S.W.3d
36, 38 (Tex. Crim. App. 2002). A trial court's discretion is abused only when a proper
question about a proper area of inquiry is prohibited. Id.

 A question that attempts to commit a juror to a particular verdict based on particular
facts is a "commitment question." See id. These questions "commit a prospective juror
to resolve, or to refrain from resolving, an issue a certain way after learning a particular
fact." Standefer v. State, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001). A commitment
question is proper if it leads to a valid challenge for cause and only includes those facts
necessary to make the challenge for cause. Id. at 182. A question may lead to a valid
challenge for cause under article 35.16(c)(2), if any venireperson "has a bias or prejudice
against any of the law applicable to the case upon which the defense is entitled to
rely. . . . " Tex. Code Crim. Proc. Ann. art. 35.16(c)(2) (Vernon 2006).

B. Analysis

 During voir dire, Vasquez attempted to ask the following question: "In a case there
[sic] someone may be proved to be having a relationship with a--with another person,
another woman or man. The fact--just the fact that the relationship exists would you
believe that he's guilty of murder . . . ?" The trial court sustained the State's objection that
this was an improper commitment question.

 At trial, the State presented evidence of an extramarital affair to show Vasquez's
motive for murdering his wife. Vasquez argues that the excluded question would have
"shown if any juror believed that having a romantic affair with another woman would make
a person more likely to murder his wife." Actually, the question asks whether the
prospective jurors would resolve the issue of guilt against the defendant if the jurors
learned a particular fact--that the defendant was having an extramarital affair. See
Standefer, 59 S.W.3d at 179. More specifically, the question sought to determine whether
a juror would automatically convict Vasquez because he was having an extramarital affair.

 The question attempted to commit the potential jurors to a particular verdict based
on a particular fact; thus, it was a commitment question. See Barajas, 93 S.W.3d at 38. 
If the question would not have lead to a valid challenge for cause, the commitment
question was improper. Standefer, 59 S.W.3d at 182. Although Vasquez contends that the
excluded question would have led to a valid challenge for cause, he has not provided
citation to authority or a clear and concise argument for this contention. See Tex. R. App.
P. 38.1(i). Moreover, because the law does not require a conviction on the basis that
Vasquez was having an extramarital affair, the question went beyond asking whether jurors
would be biased; therefore, the question was improper. See Tex. Code Crim. Proc. Ann.
art. 35.16(c)(2); Standefer, 59 S.W.3d at 181 ("[W]here the law does not require the
commitment, a commitment question is invariably improper."); see also Tex. Penal Code
Ann. § 19.02(b)(1), (2) (setting out that a person commits the offense of murder if he
"intentionally or knowingly" causes the death of an individual, or intended to cause serious
bodily injury and committed an act clearly dangerous to human life that caused the death
of an individual). Under these circumstances, we conclude that the trial court did not abuse
its discretion in sustaining the prosecutor's objection to this commitment question. See
Barajas, 93 S.W.3d at 38. We overrule Vasquez's first issue.

III. Attorney Testimony

 By his second issue, Vasquez contends that the trial court erred in allowing
Salinas's counsel, Roberto Jackson, Jr., to testify regarding Salinas's guilty plea.

 A trial court's decision regarding the admissibility of evidence is reviewed for an
abuse of discretion. Cameron v. State, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007). We
will uphold the trial court's decision if it is within the zone of reasonable disagreement. Id.

 Vasquez argues that Jackson's testimony regarding Salinas's guilty plea implies that
Vasquez is equally guilty, and that therefore "her testimony regarding the murder of Maria
del Carmen Vasquez is somehow corroborated." However, our review of the record
reveals that it was not the State that elicited the complained-of testimony. During cross-examination, Vasquez asked, "And at one time did you advise her to plead guilty?" 
Jackson responded, "No. I advised her--I gave her options, the choice was made by her." 
Furthermore, Salinas had previously testified, without objection, that she pleaded guilty to
the murder of Maria pursuant to a plea agreement. Therefore, error in the admission of
Jackson's testimony that Salinas pleaded guilty, if any, was cured. See Ethington v. State,
819 S.W.2d 854, 858 (Tex. Crim. App. 1991) (en banc) (providing that any error in the
admission of evidence is cured when similar evidence is admitted without objection either
before or after the complained-of-ruling); Jaynes v. State, 216 S.W.3d 839, 850 (Tex.
App.-Corpus Christi 2006, no pet.) (citing Leday v. State, 983 S.W.2d 713, 718 (Tex. Crim.
App. 1998)).

 Vasquez also complains that the trial court erred by admitting evidence that
Vasquez and Salinas visited with Jackson "about a criminal matter during a relevant time
period." Vasquez's argument appears to be that Jackson violated the attorney-client
privilege by testifying that Vasquez and Salinas visited him. However, he does not provide
authority, and we find none, to support a conclusion that an attorney's testimony that a
defendant visited his office about a criminal matter reveals some confidential
communication between counsel and client. See Austin v. State, 934 S.W.2d 672, 674
(Tex. Crim. App. 1996) (en banc) (providing that a client bears the burden of establishing
the existence of the attorney-client privilege). Jackson's testimony only revealed the
purpose for which he had allegedly been engaged, which is a non-confidential matter that
the attorney-client privilege does not encompass. See Duval County Ranch Co. v. Alamo
Lumber Co., 663 S.W.2d 627, 634 (Tex. App.-Amarillo 1983, writ ref'd n.r.e.) (". . . [T]he
attorney-client privilege does not encompass such nonconfidential matters as . . . the
purpose for which an attorney has been engaged, or any of the other external trappings
of the relationship between the parties.").

 Moreover, Salinas testified without objection that after Vasquez spoke to Lieutenant
Homero Alafa about the murder of Maria, he went with her to visit Jackson. Salinas stated
that they visited Jackson together because she believed that he was going to represent
both of them. According to Salinas, Jackson subsequently informed her that he could not
represent Vasquez because there was a conflict. Therefore, error, if any, in admitting
Jackson's testimony that Vasquez visited him concerning a criminal matter was cured when
the same evidence was admitted through Salinas's testimony. See Ethington, 819 S.W.2d
at 858; see Jaynes, 216 S.W.3d at 850. We overrule Vasquez's second issue.

IV. Corroborating Testimony

 In his third issue, Vasquez complains that Salinas's testimony was not sufficiently
corroborated. 

 A person cannot be convicted based upon the testimony of an accomplice unless
that testimony is "corroborated by other evidence tending to connect the defendant with
the offense committed." Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005). It is not
necessary for the corroborating evidence to be sufficient in itself to establish guilt beyond
a reasonable doubt. Gill v. State, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994) (en banc). 
The non-accomplice evidence does not have to link the accused directly to the commission
of the offense. Id. However, there must be some non-accomplice evidence that tends to
connect the accused to the commission of the offense. Id. Both direct and circumstantial
evidence may furnish the necessary corroboration. Reed v. State, 744 S.W.2d 112, 126
(Tex. Crim. App. 1988) (en banc). "Insignificant circumstances sometimes afford most
satisfactory evidence of guilt and corroboration of accomplice witness testimony." Id.

A. Accomplice Testimony

 Salinas met Vasquez at his place of employment in September 2001, and they
began having an affair in September 2002. In July 2003, Maria began calling Salinas to
learn more about Salinas's relationship with Vasquez. Salinas told Maria that they were
only friends. In October 2003, Maria slashed one of the tires on Vasquez's truck. After
Vasquez fixed the tire, he went to work and then spent the night at Salinas's apartment. 
When Salinas and Vasquez awoke the next morning, Vasquez's truck was gone. 

 On November 21, 2003, Vasquez called Salinas at about 11:00 a.m. and told her
he was going to her apartment. He arrived with Maria and told Salinas that he and Maria
were reconciling. Maria asked Salinas for the wedding ring that Vasquez had given
Salinas. Salinas stated that she would return it if Maria returned a ring Salinas had given
Vasquez. Maria claimed that she had pawned it.

 Salinas testified that Vasquez sat on the sofa with his hands in his pockets and that
she could see his hands moving. Salinas was afraid that Vasquez and Maria were going
to harm her. Vasquez suddenly stood up and kissed Maria. Vasquez then removed a cord
from his pocket and placed it around Maria's neck. Maria said, "[D]on't do it, David, don't
do it for your son." Vasquez applied pressure to Maria's neck and, when the cord started
slipping from Vasquez's grip, he asked Salinas for help. Vasquez then grabbed a power
strip and used it to "finish her off." Maria's face got very dark, and a small amount of blood
dripped from her neck. While Vasquez strangled Maria, Salinas stood there shaking and
could not move. After murdering Maria, Vasquez cut off a piece of the sofa that had blood
on it and put it in a plastic bag.

 Vasquez then checked to see if Maria was dead, laughed, and removed her jewelry. 
He told Salinas that she was next, slapped her twice, and told her to help him cover the
body and get it outside. Salinas helped Vasquez carry the body and place it in the trunk
of her car. Vasquez spent a few minutes cleaning up the scene, while Salinas watched
and cried.

 When he finished with the cleaning, Vasquez grabbed Salinas by the arm and told
her that they were going to drop the body off somewhere. They drove in Salinas's car to
a dirt road in Sullivan City where a white car was waiting. While Salinas sat in her car,
Vasquez and a man who exited the white car took Maria's body out of the trunk. After they
disposed of Maria's body, Vasquez cleaned Salinas's trunk, and they drove back to her
apartment. Vasquez told Salinas to give her living room set to a family member. Salinas
spoke to Vasquez several times that afternoon.

 The following morning, Salinas's sister, Rosa Salinas, picked up the furniture. 
Maria's sister, Bertha Isabel Lane (Betty), also went by Salinas's apartment that morning
looking for Maria. Later, Vasquez went by and told Salinas to tell the police that they were
at her apartment that day and that, because she was not feeling well, they went to Mexico
to get medicine. Salinas testified that on the day police discovered Maria's remains, she
asked Vasquez why he had killed Maria in Salinas's apartment and he replied that if he had
known she was such a "scaredy [sic] cat," he would have done it somewhere else.

 Salinas saw Vasquez every day between November 21 and December 12, 2003,
and continued to have a sexual relationship with him. During one encounter, Salinas left
several "hickies" on Vasquez's body. Pictures of red marks on various parts of Vasquez's
body were introduced into evidence.

B. Non-Accomplice Evidence 

 Because Salinas pleaded guilty to Maria's murder, her testimony is accomplice-witness testimony. The State was thus required, pursuant to article 38.44 of the Texas
Code of Criminal Procedure, to present non-accomplice evidence tending to connect
Vasquez to the crime. See Tex. Code Crim. Proc. Ann. art. 38.14.

 The State presented the testimony of several witnesses to establish that Vasquez
was with Salinas on or about 11:00 a.m. on November 21, the time Salinas claimed Maria
was murdered. "Although the presence of the accused in the company of the accomplice,
near the time of the offense, while alone is not conclusive[,] it nevertheless is an important
factor in determining corroboration." Jackson v. State, 745 S.W.2d 4, 13 (Tex. Crim. App.
1988) (en banc).

 Lieutenant Alafa testified that Vasquez told him that he had gone to Salinas's
apartment on November 21, at approximately 11:00 a.m., and that he was with her until
approximately 2:20 p.m. Vasquez also told Lieutenant Alafa that he and Salinas traveled
out of town in her vehicle and then returned to her apartment during that time period.

 Maria's sister, Lane, testified that she and Maria spoke to each other several times
daily. According to Lane, she last spoke to Maria on November 21, at 10:30 a.m., while
Maria was shopping at Foley's. Maria ended the call by telling Lane that she would call her
back, but Lane never heard from Maria again. Phone records revealed that Vasquez was
the last person Maria spoke to on November 21. Lane also testified that on November 22,
she and her husband went to Salinas's apartment because they were worried about Maria. 
When they arrived, someone was mopping the living room floor and Salinas's living room
furniture was being loaded onto a truck.

 The State also presented evidence of other suspicious circumstances. See Reed,
744 S.W.2d at 127 (providing that evidence that the accused was at or near the scene of
the crime at or about the time of its commission, coupled with other suspicious
circumstances, may tend to connect the accused to the crime so as to furnish sufficient
corroboration to support a conviction). DNA evidence established that Maria's remains had
been in the trunk of Salinas's vehicle. Maria's permanent resident alien card and Texas
driver's license were found in Vasquez's possession. Lane testified that Maria never left
home without those documents because she traveled across the border to Mexico several
times a week. Jose Ovalle, Jr., senior special agent with the "Department of Homeland
Security-Immigration, Customs Enforcement," stated that the resident alien card recovered
was authentic and current and that no duplicate cards had ever been requested. 
According to Ovalle, a resident alien card is required to re-enter the United States from
Mexico.

 The State also presented evidence that Vasquez and Salinas were having an
extramarital affair. Although proof of motive is not a required element in criminal cases,
motive is relevant as a circumstance tending to prove the commission of an offense. Bush
v. State, 628 S.W.2d 441, 444 (Tex. Crim. App. 1982) (en banc); see Reed, 744 S.W.2d
at 127 (stating that although alone, evidence of motive is insufficient as corroboration, it
may "be considered in connection with other evidence tending to connect the accused with
the crime"). Vasquez admitted to Lieutenant Alafa that he was having an affair with
Salinas. Furthermore, during the search of Salinas's apartment, police recovered evidence
of the affair including: (1) two pictures of Vasquez; (2) a pair of thong underwear with the
inscriptions, "Babe, I love you with all my heart and soul. Love David." and " Love and
kisses"; and (3) forensic samples taken from a mattress in Salinas's home containing a
mixture of Salinas's and Vasquez's DNA. Testimony revealed that Maria and Vasquez had
argued about his relationship with Salinas and that they had slashed each other's tires after
arguing about the affair. Rebecca Olivares, the "clerk register" of Maria's son's school,
testified that Maria wanted to know the procedure for withdrawing her son because
Vasquez told Maria she had to leave to Mexico without her son. Olivares stated that Maria
did not want to leave without her son.

 Finally, the State presented evidence that Vasquez's behavior was suspicious after
Maria's disappearance. On November 24, 2003, Vasquez reported to John Terry, his
insurance agent, that Maria's car was stolen. Terry testified that Vasquez insisted that
Terry backdate his missing vehicle report to state that the car had been stolen "a couple
days prior" to November 24. Terry had never had a customer request that a report be
backdated. Upon learning that Maria was missing, he asked Vasquez whether she had the
car and Vasquez replied that he did not know. Vasquez insisted that Terry file the claim. 
Terry stated, "[I]t just seemed to me he didn't seem to act like someone who's wife was
missing. . . .  [I]f [your wife has] suddenly disappear[ed], I would expect someone to be
distraught . . . And he just wasn't." 

 Francisco Guerrero, an officer who informed Vasquez that his wife was deceased,
testified that Vasquez showed no emotion and was non-responsive at the news that his
wife had been found burned and dismembered. Guerrero found Vasquez's response to
this news so unusual that it prompted him to ask Vasquez if he understood what he had
just been told. 

 Finally, Sergeant Morales testified that Vasquez told him that Maria had taken a
check in the amount of $7,000 with her and that he subsequently closed their bank
accounts because he feared Maria would withdraw more money from them. Phone
records revealed that Vasquez called Salinas approximately two hundred times at different
hours of the day and night between November 22 and December 11, 2003.

 While the foregoing circumstances individually may not each be sufficient to
corroborate the accomplice testimony, we conclude that, taken together, rational jurors
could conclude that this evidence sufficiently tends to connect Vasquez to the offense. 
See Cox v. State, 830 S.W.2d 609, 612 (Tex. Crim. App. 1992) (en banc) (concluding that
evidence of other suspicious circumstances filled the sufficiency gap left by evidence of
appellant's mere presence at scene of offense); Paulus v. State, 633 S.W.2d 827, 846
(Tex. Crim. App. 1981) (en banc) (noting that evidence showing motive or opportunity can
be considered in connection with other evidence tending to connect the accused with the
crime). Accordingly, we overrule Vasquez's third issue.

V. Sufficiency of the Evidence

 By his fourth and fifth issues, Vasquez contends that the evidence is legally and
factually insufficient to sustain his conviction. Specifically, by his fourth issue, Vasquez
argues that "[t]he myriad of evidence brought by the State did not tie [him] to the murder." 
In his fifth issue, Vasquez argues that the verdict in this case is clearly wrong and
manifestly unjust because the evidence did not tie him to the murder.


A. Standard of Review

 In conducting a legal sufficiency review, we view the relevant evidence in the light
most favorable to the verdict to determine whether a rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt. Hooper v. State, 214
S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing Jackson v. Virginia, 443 U.S. 307, 318-19
(1979)); Escamilla v. State, 143 S.W.3d 814, 817 (Tex. Crim. App. 2004). We do not
reevaluate the weight and credibility of the evidence, and we do not substitute our own
judgment for the trier of fact. King v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000)
(en banc); Beckham v. State, 29 S.W.3d 148, 151 (Tex. App.-Houston [14th Dist.] 2000,
pet. ref'd). Instead, we consider whether the jury reached a rational decision. Beckham,
29 S.W.3d at 151.

 In a factual sufficiency review, we review the evidence in a neutral light to determine
whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly
unjust or against the great weight and preponderance of the evidence. Watson v. State,
204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). This Court will not reverse the jury's
verdict unless we can say with some objective basis in the record that the great weight and
preponderance of the evidence contradicts the verdict. Id. at 417.

 Both legal and factual sufficiency are measured by the elements of the offense as
defined by a hypothetically correct jury charge. Malik v. State, 953 S.W.2d 234, 240 (Tex.
Crim. App. 1997); Adi v. State, 94 S.W.3d 124, 131 (Tex. App.-Corpus Christi 2002, pet.
ref'd). Under a hypothetically correct jury charge, Vasquez committed the offense of
murder if he "intentionally or knowingly" caused the death of Maria, or intended to cause
her serious bodily injury and committed an act clearly dangerous to human life that caused 
her death. See Tex. Penal Code Ann. § 19.02(b)(1), (2). A person acts "intentionally, or
with intent, with respect to the nature of his conduct or to a result of his conduct when it is
his conscious objective to engage in that conduct or cause the result." Id. § 6.03(a)
(Vernon 2003).

B. Analysis

 To support his contention that the evidence is legally insufficient, Vasquez points
to the following: (1) there was no blood found on his white "Dickies" jacket; (2) the DNA
evidence from a cigarette found near the area where Maria's remains were discovered did
not match Vasquez's DNA; and (3) white pieces of fiberglass found near Maria's body did
not come from his truck. In support of his factual sufficiency challenge, Vasquez argues
that the following facts do not lead to a rational conclusion that he killed Maria: (1) he had
an affair; (2) he claimed that his adopted son was his biological son; and (3) Maria had a
life insurance policy.

 Vasquez appears to be arguing that there is no direct physical evidence proving he
committed the murder. However, as stated above, the State established through Salinas's
testimony that on November 21, 2003, Vasquez intentionally caused Maria's death by
wrapping a cord around her neck and strangling her. See McDuff v. State, 939 S.W.2d
607, 614 (Tex. Crim. App. 1997) (en banc) (noting that in evaluating the legal sufficiency
of evidence of guilt, we must consider all of the evidence including accomplice-witness
testimony). Additionally, the non-accomplice evidence corroborates Salinas's testimony. 
The jury had the opportunity to observe and evaluate the witnesses' credibility and
demeanor and to weigh the evidence presented to them by the State. See Johnson v.
State, 23 S.W.3d 1, 8 (Tex. Crim. App. 2000). The jury chose to believe Salinas's
testimony that Vasquez murdered Maria. Therefore, viewing the evidence in a neutral light
and giving due deference to the jury's determination of the weight to be given the evidence,
we conclude that a rational trier of fact could have found the essential elements of the
crime beyond a reasonable doubt. See Hooper, 214 S.W.3d at 13; Escamilla, 143 S.W.3d
at 817. Thus, the evidence is legally sufficient to support the verdict. Furthermore, having
reviewed the entire record, we cannot say that the evidence is so weak that the jury's
determination was clearly wrong or that conflicting evidence so greatly outweighed the
evidence supporting the conviction that the jury's determination was manifestly unjust. See
Watson, 204 S.W.3d at 414-15, 417; Johnson, 23 S.W.3d at 11. Thus, the evidence is
factually sufficient. We overrule Vasquez's fourth and fifth issues.

VI. Admission of Photographs into Evidence

 By his sixth issue, Vasquez contends that the trial court reversibly erred by admitting
into evidence State's exhibit 198, a picture Vasquez describes as his "mug shot." Vasquez
argues that there was no justification to show the picture and that it served only one
purpose: "to inflame the jury and prejudice the Defendant [Vasquez]." 

 The complained-of picture shows the head and shoulders of a shirtless Vasquez
with red marks on his shoulder, arm, and upper chest. In the picture, Vasquez is standing
in front of a light background with height measurement markers behind him. There are no
police identification markings in the picture. The picture was admitted through Sergeant
Lara's testimony, when he testified that the marks appeared to be "hickies." The picture
was offered to support Salinas's testimony that she had continued having sex with Vasquez
after Maria's death. Vasquez objected to the admission of the photograph on the basis
that its prejudicial value outweighed any probative effect. See Tex. R. Evid. 403.

 Mug shots are often found to be inadmissible when they are obtained from a
previous arrest and show the commission of an extraneous offense, potentially infringing
on a defendant's fundamental right to the presumption of innocence. See, e.g.,
Richardson v. State, 536 S.W.2d 221, 223 (Tex. Crim. App. 1976) (concluding that
appellant's mug shot showing the police department's identification marker "tended to show
the commission of an extraneous offense and, therefore, [infringed on] appellant's
fundamental right to the presumption of innocence"); Alexander v. State, 88 S.W.3d 772,
780-81 (Tex. App.-Corpus Christi 2002, pet. ref'd) (holding that a mug shot of appellant
showing that he had previously been arrested was improperly admitted). However,
Vasquez does not allege the photo was taken for a previous offense. In addition, prior to
the photo being admitted, testimony revealed that Vasquez had been taken into custody
on the day the photo was taken. See Reyes v. State, 579 S.W.2d 927, 928 (Tex. Crim.
App. 1979) (providing that the complained-of photograph was taken of appellant as a result
of his being arrested for the present offense and in no way suggested that appellant had
had previous encounters with the police); Ware v. State, 628 S.W.2d 249, 251 (Tex.
App.-Fort Worth 1982, pet. ref'd) (noting that evidence of the time a defendant had been
booked in conjunction with a corresponding date on the mug shot "vitiated the introduction
of extraneous offenses"). Vasquez even concedes that it was taken while in police custody
for the present offense. Moreover, the picture contains no overt markings specifically
identifying it as a "mug shot," such as a chest plate depicting the name of the police
department or case number. See Reyes, 579 S.W.2d at 928 (providing that the preferred
practice in admitting "mug shots" is to remove the police identification marks before the
photograph is introduced to the jury); Huerta v. State, 390 S.W.2d 770, 772 (Tex. Crim.
App. 1965) (concluding that the trial court did not err in admitting a picture of appellant
because "[a]ll identification marks were removed, and, as far as the jury was able to
determine, it might have been taken in a penny arcade"). Under these circumstances, we
conclude that the trial court did not abuse its discretion in admitting the complained-of
picture.

 Vasquez next argues that when the photograph "was left on the over-head projector
for a time" he was "further damage[d] and prejudiced" because "the purpose of entering
these photographs was clearly to imply that the Defendant [Vasquez] visited a lawyer
because he was guilty." Vasquez's argument is based on the premise that the photograph
was admitted into evidence when attorney Jackson testified. However, the record shows
that the complained-of picture was admitted through Sergeant Lara's testimony. Therefore,
we are not persuaded by Vasquez's argument. Vasquez also complains that the trial court
erred in admitting several other pictures of him into evidence. However, at trial, Vasquez
only objected to State's exhibit 198. Therefore, Vasquez has not preserved error regarding
the other exhibits. See Tex. R. App. P. 33.1. We overrule Vasquez's sixth issue.

VII. Jury Argument

 By his seventh issue, Vasquez contends that the trial court committed error by
allowing the State to rely on evidence outside the record during its closing argument. 
However, Vasquez did not object to the prosecutor's argument and therefore failed to
preserve error. See Mathis v. State, 67 S.W.3d 918, 927 (Tex. Crim. App. 2002)
(concluding that appellant forfeited right to complain on appeal concerning the State's
improper jury argument by failing to object at trial); Cockrell v. State, 933 S.W.2d 73, 89
(Tex. Crim. App. 1996) (en banc) ("Before a defendant will be permitted to complain on
appeal about an erroneous jury argument or that an instruction to disregard could not have
cured an erroneous jury argument, he will have to show he objected and pursued his
objection to an adverse ruling."). We overrule Vasquez's seventh issue.

VIII. Conclusion

 We affirm the trial court's judgment.


 NELDA V. RODRIGUEZ

 Justice


Do not publish. 

Tex. R. App. P. 47.2(b).


Memorandum Opinion delivered and 

filed this 22nd day of January, 2009.